## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

MODERN REMODELING, INC.                    *
                                       *
                                       *      Civil Action No. CCB-19-1397
v.                                         *
                                       *
TRIPOD HOLDINGS, LLC, *et al.*             *
                                       *
                                    *****

## MEMORANDUM

Now pending is a motion in limine filed by Modern Remodeling, Inc. ("MRI") to exclude

certain opinions of expert witness Mr. Steven Stern. (ECF 176, Pl.'s Mots. in Limine). For the

purpose of this motion, the defendants consist of two groups: the Tripod[1] Defendants and the

Sales[2] Defendants. The Tripod Defendants have responded (ECF 179, Opp'n to Pl.'s Mots. in

Limine) and the Sales Defendants have adopted the Tripod Defendants' opposition (ECF 180,

Defs. Edwards, Keenan, Moran, and Olesky's Line Joining Tripod Defs.' Answer Pl.'s Mot. in

Limine). MRI has replied (ECF 186, Pl.'s Reply Supp. Mots. in Limine), and the court heard oral

argument on October 1, 2021. Trial is underway. In this memorandum, the court will address

MRI's motion as to Stern's opinions.

## BACKGROUND

### The case's origins

MRI is a general contracting company that works in the insurance restoration industry; it

assists clients with maximizing insurance coverage and performing repairs following natural

disasters. Jonathan Ballard owns MRI, which is based in Virginia but has an office in Maryland.

This action concerns the personnel at the Maryland office. Relevant here, Stephen Trancucci and

---

[1] The Tripod Defendants include Tripod Holdings, High Mark Construction, Strong Wall Construction, MGB Investments, Patrick Boyle, and Robert Kimball. David Drab has been dismissed.

[2] The Sales Defendants include Earl Edwards, Robert Keenan, Randy Moran, and Matthew Olesky.

Boyle headed that office;[3] Kimball was a sales manager; Drab was the Director of the Complex Division; and Edwards, Keenan, Moran, and Olesky were in sales.

In MRI's view, Boyle, Kimball, and Drab started planning to create a rival company (the Tripod Entities) in the spring of 2018. They allegedly stopped working for the benefit of MRI, used MRI resources to establish the Tripod Entities, and solicited MRI employees such as the Sales Defendants to work for Tripod.

Tripod began operations in February 2019, though Trancucci and others at MRI did not learn of its existence until April 17, 2019. Meanwhile, between December 2018 and April 2019, the Tripod Defendants and Sales Defendants left MRI and joined Tripod.[4] Between February 2019 and April 23, 2019, MRI believes that Boyle secretly acted as an agent for Tripod while he remained in MRI's employ.

On April 23, 2019, Boyle resigned from MRI over the phone and Trancucci directed him not to alter his laptop before he brought it in. (*See* ECF 130-16, Ex. 15, Trancucci Dep. at 585:1–8). When MRI eventually had the laptop forensically imaged, MRI's expert concluded that Boyle deleted the contents of the laptop at 7:19 p.m. on April 23, 2019, by means of a factory reset. (*See* ECF 130-18, Ex. 17, Forensics Report at MRI006673). Kimball also had wiped his laptop before turning it in, though he did so on January 4, 2019, months before any obligation to preserve the data arose.

The next day — the day after Boyle resigned — MRI sent the defendants cease and desist letters instructing them not to destroy or delete any documents or files related to these issues and

---

[3] The exact title and status of Patrick Boyle is disputed.

[4] Keenan left on December 31, 2018; Kimball on January 8, 2019; Olesky on January 23, 2019; Drab on January 25, 2019; Moran on February 8, 2019; Edwards on February 22, 2019; and Boyle on April 23, 2019.

to suspend any normal documentation, email or electronic information destruction policies or programs. (*See* ECF 130-19, Ex. 18).

On May 10, 2019, MRI brought this unfair competition suit against the defendants. The amended complaint contains ten counts for breach of contract; violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030; breach of the duty of loyalty; tortious interference with a contract; tortious interference with a prospective business advantage; civil conspiracy; conversion; unfair competition; and unjust enrichment. (*See* ECF 64).

### Stern's expert testimony

The defendants hired Mr. Steven Stern of Safe Harbor Discovery, LLC, as an expert witness to discuss the technological and forensic issues surrounding Boyle and Kimball wiping or deleting data from their MRI laptops. Stern reviewed MRI's forensic expert report, depositions and interviews with the defendants, the MRI employee handbook, and a variety of other documents. (ECF 176-8 at 2–3). He did not examine copies of the relevant electronic media. (*Id.* at 2).

Based on his understanding of MRI's workflow after the interviews, Stern's report said he believed MRI lost no critical business information when Boyle and Kimball wiped their laptops. (ECF 176-8 at 5). He said that all critical business information also existed either in paper form, in MRI emails, or in MRI's cloud-based customer relations management system. (*Id.* at 6–8).

Stern's expert report opines that Boyle and Kimball "properly" restored their MRI laptops to factory default settings using the laptop's operating system's built-in functionality. (*Id.* at 11, 12). The thrust of the relevant sections of his report is that Boyle and Kimball's laptops contained both MRI data and their personal data, and the factory reset tool included only built-in

options to either keep all data (including their personal data) or wipe all data (including MRI's data) — there was no automated option to keep MRI's data but wipe their personal data. (*Id.* at 11–13). Presented with these precise options, he says, Kimball and Boyle were therefore "obligated" to remove their personal data by entirely wiping the computers or else risk that their data would be available to a future use of the laptop. (*Id.*). In his opinion, they acted without malice. (*Id.* at 13).

In deposition testimony, Stern said his opinions of Boyle's and Kimball's decisions was based on his 23 years working with companies and dealing with employees leaving and returning to those companies. (*Id.* at 141:12-16). He advocated for the position that when an employee leaves a job, he should do a factory reset on his company computer (*Id.* at 142:15-25), though this could lead to the loss of data that was on the computer but not backed up to the cloud (*Id.* at 145:9-24) and that a company official might want to extract before the reset (*Id.* at 153:15-23). When asked whether he was expressing his personal opinion or an industry-accepted best practice, he responded that it was "an industry standard practice that I follow." (*Id.* at 149:22–150:20). He did not name a specific source for that industry standard practice, and he answered that its source was not the National Institutes of Standards and Technology, System and Organization Controls (mis-named by counsel as "Service and Organization Control"), or International Organization for Standardization standards. (*Id.* at 150:7-20).

MRI filed this motion to preclude Stern from offering expert testimony related to (I) whether the defendants caused MRI to lose business information; (II) whether Kimball's and Boyle's actions in wiping their MRI-issued laptops were proper; and (III) Kimball's and Boyle's state of mind when they wiped their MRI-issued laptops. (ECF 176-1 at 2).

4

**ANALYSIS**

MRI seeks to preclude Steven Stern's expert opinions about three main topics initially outlined in his expert report:

1)  **No critical information loss:** MRI did not lose any critical business information from any action by the defendants prior to returning the devices relevant to this matter, including that:

    a)  Edwards, Kimball, Drab, and Boyle did not delete from their MRI laptops any MRI business data that is not otherwise available from MRI backups or paper copies or duplicated in the CRM; and

    b)  Edwards's MRI laptop did not contain any critical business information on it and did not cause any MRI business documents to be lost.

2)  **Wiping was proper:** Kimball and Boyle properly wiped their computers.

3)  **No malice in wiping:** Kimball and Boyle acted without malice.

(ECF 176-7, Stern Report at 5–9, 11–14; ECF 176-1 at 17). MRI argues that these opinions are unhelpful, not based on sufficient facts and data, unreliable, and irrelevant.

The Fourth Circuit recently summarized the law of expert testimony admissibility:

> Rule 702 permits expert testimony if that testimony is (1) helpful to the jury in understanding the evidence or determining a fact at issue, (2) "based on sufficient facts or data," (3) "the product of reliable principles and methods," and (4) the product of a "reliabl[e] appli[cation] of th[ose] principles and methods to the facts of the case." Rule 702 thus "imposes a special gatekeeping obligation on the trial judge" to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Nease v. Ford Motor Co.*, 848 F.3d 219, 229–30 (4th Cir. 2017) (quoting *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 597 (1993)).
> An expert's opinion is relevant if it has "a valid scientific connection to the pertinent inquiry." *Belville v. Ford Motor Co.*, 919 F.3d 224, 232 (4th Cir. 2019) (quoting *Daubert*, 509 U.S. at 592). This ensures that the expert "helps 'the trier of fact to understand the evidence or to determine a fact in

5

issue.'" *Nease*, 848 F.3d at 229 (citation omitted). Simply put, if an opinion is not relevant to a fact at issue, *Daubert* requires that it be excluded.

But even if relevant, an opinion must also be sufficiently reliable. Reliability is a "flexible" inquiry that focuses on "the principles and methodology" employed by the expert. *Daubert*, 509 U.S. at 594–95. Specifically, district courts must ensure that an expert's opinion is "based on scientific, technical, or other specialized knowledge and not on belief or speculation." *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999). And to the extent an expert makes inferences based on the facts presented to him, the court must ensure that those inferences were "derived using scientific or other valid methods." *Id.*

*Daubert* provides four[] non-exhaustive "guideposts" to aid in the required reliability analysis: (1) whether the expert's theory or technique "can be (and has been) tested"; (2) "whether the theory or technique has been subjected to peer review and publication"; (3) "the known or potential rate of error" inherent in the expert's theory or technique; and (4) whether the expert's methodology is generally accepted in his field of expertise. *Nease*, 848 F.3d at 229 (quoting *Daubert*, 509 U.S. at 593–94). But this list "neither necessarily nor exclusively applies to all experts or in every case," as the relevance of some factors can "depend[ ] on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 150 (1999) (citation omitted). Accordingly, trial courts are typically given "broad latitude" to determine which of these factors (or some other unspecified factors) are "reasonable measures of reliability in a particular case." *Nease*, 848 F.3d at 229 (quoting *Kumho Tire*, 526 U.S. at 153). But that broad discretion does not allow a district court to delegate the issue to the jury.

*Sardis v. Overhead Door Corp.*, 10 F.4th 268, 281 (4th Cir. 2021). "As in all questions of admissibility," the party seeking the admission of expert testimony "must come forward with evidence from which the court can determine that the proffered testimony is properly admissible" — i.e., that it is reliable and relevant. *Maryland Cas. Co. v. Therm-O-Disc, Inc.*, 137 F.3d 780, 783 (4th Cir. 1998). Yet the trial court's role as a gatekeeper is not intended to serve as a "replacement for the adversary system, and consequently, the rejection of expert testimony is the exception rather than the rule." *See In re Lipitor (Atorvastatin Calcium) Marketing, Sales Practices and Prods. Liab. Litig.*, 892 F.3d 624, 631 (4th Cir. 2018) (internal quotation omitted).

6

A trial judge, acting as gatekeeper, must keep in mind two sometimes competing principles when deciding whether to admit an expert's conclusions. First, Rule 702 was intended to liberalize the introduction of relevant expert testimony and thus encourages courts to rely on vigorous cross-examination and presentation of contrary evidence to counterbalance expert opinions of uncertain veracity. *See Daubert*, 509 U.S. at 588, 596; *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999). Simultaneously, however, a trial court must keep in mind the high potential for expert opinions to mislead, rather than enlighten, a jury. *Westberry*, 178 F.3d at 261.

## I. Loss of data

MRI seeks to exclude Stern's opinion that MRI did not lose any critical business information from various of the defendants' MRI laptops because the information was available through MRI backups, paper copies, or on MRI's cloud-based CRM.

Stern's testimony on this issue is unhelpful to the jury and therefore irrelevant under Rule 702. At its core, Stern's opinions are based not on his forensic or technical expertise but rather on interviews with Boyle and other defendants. His opinions largely recycle their testimony and do not relate directly to any genuine issue in this case.

"When laypersons are just 'as capable of comprehending the primary facts and of drawing correct conclusions from them' as are experts, expert testimony may properly be excluded." *Scinto v. Stansberry*, 841 F.3d 219, 230 (4th Cir. 2016) (citation omitted) (discussing the absence of expert medical testimony on the seriousness or an injury or illness and the risk of leaving that injury or illness untreated). "The helpfulness requirement of Rule 702 thus prohibits the use of expert testimony related to matters which are 'obviously . . . within the common knowledge of jurors.'" *United States v. Lespier*, 725 F.3d 437, 449 (4th Cir. 2013) (quoting *Scott*

*v. Sears Roebuck & Co.*, 789 F.2d 1052, 1055 (4th Cir. 1986)) (describing the effects of sleep deprivation and the validity of eyewitness identification as "readily comprehended by jurors" and therefore not requiring an expert for explanation).

Stern conducted three interviews, reviewed Edwards's deposition, reviewed MRI's forensics expert's report, and reviewed other MRI documents provided to him. (ECF 176-8 at 4). He did not inspect mirrored images of the computers in question. (*Id*. at 2–3).

First, Stern's opinion relies on common sense rather than on technical or specialized knowledge. While the subject matter of Rule 702 testimony need not necessarily be arcane or difficult to comprehend, *United States v. Perkins*, 470 F.3d 150, 155 (4th Cir. 2006), allowing experts to opine on "the commonplace" "might supplant a jury's independent exercise of common sense." *See Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993) (quoting *Scott*, 789 F.2d at 1055). The jury is perfectly capable of comprehending both a laptop reset to factory settings and a cloud-based storage system, and the witness who describes these need not be an expert.

Second, Stern's opinion merely summarizes the defendants' unverified testimony and lends it greater credence. In arriving at his opinion on MRI's data loss, he did not inspect mirrored hard drive images but instead relied primarily on interviews with Boyle and Kimball. (ECF 176-8 at 5). These interviews revealed information about the workflow and recordkeeping habits of MRI's employees. (*Id*. at 5). "Based on this workflow," it was Stern's opinion that no critical information was lost due to wiping the laptops. (*Id*. at 6). And based on similar information about work practices at MRI (obtained via interview and MRI's employee handbook), Stern likewise opined that MRI's corporate documents were stored in paper format, corporate email, or on MRI's CRM. (*Id*. at 8). Where an opinion is based entirely on the defendants' testimony which the jury can readily comprehend without expert assistance, Rule

8

702's gatekeeping requirement, which contemplates experts' outsized power and guards against the abuse of a jury's perceptions of expertise, clearly applies.

Third, Stern's opinion does not relate to any issue in dispute in this case. The plaintiffs do not seek to recover for any critical business information lost through the factory reset of the defendants' laptops; instead, the losses they assert under the Computer Fraud and Abuse Act (CFAA) are purely for the cost of the investigation and damage to a computer. *See A.V. ex rel. Vanderhyne v. iParadigms LLC*, 562 F.3d 630, 646 (4th Cir. 2009) (loss includes costs incurred responding to CFAA violation). Further, the CFAA claims require as an element that the plaintiff establish data damage on the protected computer itself; the existence of cloud-based copies is irrelevant. So the question of whether MRI lost critical business information through the factory resets is likewise largely irrelevant in this case about unfair competition.

The defendants argue that these opinions are helpful because they can explain the technological effects of a factory reset and the technological operation of a cloud-based data storage system. But the opinions MRI challenges do not involve these technological aspects, and neither Stern's deposition testimony (ECF 208) nor his expert report (ECF 176-8) focus on those technological questions. The most he presents are two screenshots of the Windows factory reset application and a description of the user options (essentially, "delete everything" and "delete nothing") the factory reset process offers (ECF 176-8 at 20, 11).

Having found Stern's opinion on the loss of critical business data irrelevant, the court need not consider its reliability; it has failed Rule 702 scrutiny and is excluded.

## II. The propriety of wiping the computers

"While district courts have broad discretion in analyzing reliability, such discretion does not include the decision to abandon the gatekeeping function. Rather, it is discretion to choose

among *reasonable* means of excluding expertise that is *fausse* and science that is junky." *Sardis*, 10 F.4th at 282 (cleaned up) (citing *Nease*, 848 F.3d at 230, and *Kumho Tire*, 526 U.S. at 158–59 (Scalia, J., concurring)) (emphasis in original). In *Sardis*, according to the Fourth Circuit, the district court reflexively found that the moving party's arguments went to the weight of the expert's testimony rather than its admissibility, thereby abandoning its gatekeeping function and abusing its discretion. *Sardis*, 10 F.4th at 282.

An expert's chosen method might reasonably be applying extensive experience to analyze the facts at bar. *See United States v. Galloway*, 749 F.3d 238, 245 (4th Cir. 2014) (upholding reliability and admissibility of an expert witness who operated under the *principle* that drug-related conversations involve code words and then used the *method* of applying the expert's extensive experience to analyze the conversations' meaning). Indeed, the text of Rule 702 "expressly contemplates that an expert may be qualified on the basis of experience," as in certain fields, "experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." Fed. R. Evid. 702 advisory committee's note to 2000 amendment. But if "the witness is relying solely on or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts" — a more stringent standard than simply "taking the expert's word for it." *Id.* "The more subjective and controversial the expert's inquiry, the more likely the testimony should be excluded as unreliable." *Id.*

Stern has offered some support for his opinion that it is an industry standard practice for employees to wipe their computers without giving employers a chance to retrieve business data, but that support cites to no verifiable external authorities in his field, relying solely on his own years of experience as to what is proper. These years of experience may be an adequate basis for

his initial qualification as an expert, but the court cannot stop there; it must further judge his testimony's basis in facts, reliable principles, and reliable application of those principles to assess its reliability in the face of a *Daubert* challenge. Without any objectively verified industry standards to corroborate Stern's opinion, his account of his own professional experience is the only basis for his conclusions about the propriety of Boyle's and Kimball's factory resets. He cites a few reasons why it was proper for the employees to wipe their laptops without offering an opportunity for MRI to recover any business data: (1) Most or all of MRI's information was backed up to the cloud; (2) Others might have taken more drastic measures, like removing the hard drives entirely, so this is less intrusive by comparison; (3) MRI might be liable for an employee's data if it were somehow compromised, so the employees were actually helping MRI; (4) selectively removing personal data and leaving business data intact still leaves the employee at risk of inadvertent disclosure if they do not properly remove their personal data; (5) an employer who is not tech-savvy might actually prefer that the employee wipe the computer if there is no IT or HR department to conduct the process. (ECF 208 at 141–49). At the same time, he agrees there are reasons why an employer might not want the laptop reset. (*Id.* at 145:16-18, 146:24–147:2, 148:1-3, 149:17). At bottom, his opinion is nothing more than a collection of different circumstances, with different reasons and results depending on those circumstances, that he has observed over the years.

The defendants would have the court believe that these are reliable explanations of how Stern's experience leads him to conclude that Boyle and Kimball acted properly. But the court cannot rubber-stamp these justifications as reliable expert opinion. The issue is not whether the court believes or disbelieves Stern's testimony but rather that his opinion is subjective and sufficiently controversial that the court cannot take his word for it. To acknowledge this core

unreliability and yet leave it to the jury as a question of weight would be to abdicate the court's

gatekeeping function. Stern's opinions on the propriety of Boyle's and Kimball's decision to

wipe their laptops are unreliable and therefore excluded.[5]

### III. Boyle's and Kimball's malice

Stern may not testify that Boyle and Kimball acted without malice when they wiped their

MRI laptops. A "defendant's knowledge [or] state of mind . . . are not appropriate subjects of

expert testimony because opinions on these matters will not assist the jury." *Tyree v. Boston*

*Scientific Corp.*, 54 F. Supp. 3d 501, 553 (S.D. W.Va. 2014) (citing to *In re Rezulin Pros. Liab.*

*Litig.*, 309 F. Supp. 2d 531 (547 (S.D.N.Y. 2004), which ruled that "the question of intent is a

classic jury question and not one for the experts"); *United States v. Lab. Corp. of Am. Holdings*,

No. 9:14-3699, 2021 WL 2253360, *4 (D.S.C. June 3, 2021). Accordingly, Stern's opinions

related to Boyle's and Kimball's degree of malice or state of mind in wiping their laptops are

excluded.

### CONCLUSION

For the reasons discussed herein, MRI's motion in limine to exclude certain of Mr. Steven

Stern's expert opinions is granted. A separate Order follows.

$\frac{11}{9}\frac{9}{21}$
Date

Catherine C. Blake
United States District Judge

---

[5] Moreover, as to Boyle, the court already has concluded that Boyle improperly wiped his MRI laptop after a preservation obligation had arisen. (ECF 195 at 15 § I(A)(1)(a)).

12